## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

LOUREN SKRYWER,                           *
                                          *
Plaintiff,                                *
                                          *
v.                                        *          Civ. No.  MJM-21-3007
                                          *
JULIA IMENE-CHANDURU, *et al.*            *
                                          *
Defendants.                               *
                          * * * * * * * * * * *

## <u>MEMORANDUM OPINION</u>

Louren Skrywer ("Plaintiff") commenced this civil action against Julia Imene-Chanduru ("Ms. Imene-Chanduru"), Simbarashe Britone Chanduru ("Mr. Chanduru"), and the Republic of Namibia ("Namibia") (collectively, "Defendants") for involuntarily servitude, forced labor, indentured servitude and forced labor trafficking, and unlawful passport concealment and possession in violation of federal law.

Currently pending are two motions to dismiss for lack of jurisdiction—one by the individual defendants Ms. Imene-Chanduru and Mr. Chanduru (collectively, the "Chandurus"), and the other by Namibia. The Court has reviewed all filings submitted by the parties and has determined that a hearing on the motions is not necessary. L. R. 105.6. The primary issues presented in the motions are whether Namibia has sovereign immunity from this suit under the Foreign Sovereign Immunities Act ("FSIA") and whether Ms. Imene-Chanduru and Mr. Chanduru each has diplomatic immunity from this suit. Based on the facts and evidence presented, the Court concludes that Namibia has sovereign immunity under FSIA, and the commercial activity and tortious act exceptions do not apply in this case. However, neither Ms. Imene-Chanduru nor Mr. Chanduru has diplomatic immunity. Accordingly, Namibia's motion to dismiss shall be GRANTED, and the Chandurus' motion to dismiss shall be DENIED.

1

I.      **Factual Background**[1]

Plaintiff, a citizen of Namibia, came to the United States with Ms. Imene-Chanduru and Mr. Chanduru in 2007, after Ms. Imene-Chanduru was elevated to the post of First Secretary to the Namibian Embassy in Washington, D.C. Am. Compl. (ECF 63) ¶¶ 21–22. The Chandurus are a married couple. *Id.* ¶¶ 4–5. Plaintiff alleges that her family has been in a position of servitude to Ms. Imene-Chanduru's family for generations, often for little to no pay, and that she grew up working for Ms. Imene-Chanduru's family at their mansion in Namibia. *Id.* ¶¶ 11–16. Ms. Imene-Chanduru offered to bring Plaintiff to the United States to work as a nanny for her newborn daughter for $1,500 every two weeks (a salary far beyond what would be possible in their home country), plus health insurance, paid holidays, and weekends off. *Id.* ¶¶ 22–24. Plaintiff signed a written contract, but Ms. Imene-Chanduru refused to give her a copy. *Id.* ¶ 28. Ms. Imene-Chanduru handled Plaintiff's passport and A-3 visa applications. *Id.* ¶¶ 34–40. Plaintiff's only role in the process was obtaining a passport photo and participating in a visa interview at the United States consulate—and Ms. Imene-Chanduru accompanied Plaintiff in both instances. *Id.* ¶¶ 35, 38. Ms. Imene-Chanduru maintained complete physical control over Plaintiff's immigration papers, except for a few minutes during an immigration and customs check upon arrival in the United States. *Id.* ¶ 42.

From 2007 to 2011, while living at the Chandurus' residence in Silver Spring, Maryland, Plaintiff was subjected to physical isolation, emotional abuse, and forced labor. *Id.* ¶¶ 43–45. Plaintiff estimates that she was expected to work 18 hours a day, seven days a week. *Id.* ¶ 54. In addition to caring for the Chandurus' child at all times, Plaintiff was required to perform various domestic tasks for the Chandurus, to cater personal events for the Chandurus' friends and

---

[1] The following facts are drawn from allegations in Plaintiff's Amended Complaint. ECF 63.

Namibian politicians at the residence, and to babysit children of guests in the basement of the Namibian Embassy during official functions. *Id.* ¶¶ 49–52. Despite working more hours than expected and performing tasks she had never agreed to, Plaintiff was paid substantially less than agreed upon in the contract, receiving $500 the first month and roughly $150 per month thereafter. *Id.* ¶¶ 55–60. The Chandurus also made deductions from Plaintiff's salary to cover her room and board, even though she shared a room with the Chandurus' infant child, these deductions had not been agreed upon in the contract, and the Namibian government was paying the rent for the residence. *Id.* ¶ 63. The Chandurus also did not cover Plaintiff's healthcare costs, contrary to the terms of the contract. *Id.* ¶ 61.

According to Plaintiff, the Chandurus were verbally abusive to her throughout their time living together, often mocking and belittling her, and regularly threatening to have her deported to Namibia. *Id.* ¶¶ 69–72. The Chandurus held onto her passport and visa and refused to return them to her, despite her requests on several occasions over the four-year period. *Id.* ¶¶ 78–80. Additionally, the Chandurus allowed Plaintiff's visa to expire and refused to renew it; would not permit her to obtain a supplemental source of income until late 2011; forbade her from obtaining a driver's license or credit card; and restricted her contact with outside individuals after the nanny for another diplomat caused Plaintiff to question her treatment by the Chandurus. *Id.* ¶¶ 81–92. After a heated argument with Mr. Chanduru in late 2011, Plaintiff demanded her passport so that she could leave. *Id.* ¶¶ 127–132. Mr. Chanduru acquiesced, and Plaintiff quickly packed some of her belongings and moved in with an acquittance in Burtonsville, Maryland. *Id.* ¶¶ 136–37.

Ms. Imene-Chanduru's post at the Namibian Embassy ended in December 2011, but she remained in the United States serving in various positions at the United Nations headquarters in New York until November 2020. *Id.* ¶¶ 148–50. In February 2021, Ms. Imene-Chanduru was

assigned to a new position as Namibia's Permanent Representative to the United Nations in Geneva, Switzerland, where she and Mr. Chanduru have since resided. *Id.* ¶¶ 150–53.

## II.   **Procedural History**

On November 23, 2021, Plaintiff filed a Complaint against Ms. Imene-Chanduru, Mr. Chanduru, and Namibia, ECF 1, to which the Chandurus filed an Answer, ECF 24. On March 3, 2023, Namibia filed a motion to dismiss the Complaint for lack of jurisdiction. ECF 53. Plaintiff filed an Amended Complaint on March 17, 2023. ECF 63. On March 31, 2023, Namibia again filed a motion to dismiss for lack of jurisdiction, ECF 71, and the Chandurus filed a separate motion to dismiss for lack of subject matter jurisdiction on the same date, ECF 69. Plaintiff filed a response in opposition to each motion, ECF 78 & 86, to which the Chandurus and Namibia each filed a reply, ECF 82 & 91.

## III.   **Standard of Review**

A defendant may challenge a court's subject matter jurisdiction of a case by filing a motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure.[2] The plaintiff bears the burden of proving that the court indeed has jurisdiction over the matter. *Demetres v. E. W.Constr., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015) (citing *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999)). When subject matter jurisdiction is at issue, "the court is to regard the pleadings 'as mere evidence on the issue, and may consider evidence outside the pleadings . . . .'" *Burns v. Wash.*

---

[2] In its motion, Namibia requests dismissal pursuant to Rule 56 of the Federal Rules of Civil Procedure. ECF 71 at 1. Rule 56 provides that a court shall grant summary judgment upon motion of a party "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Namibia offers no argument or explanation as to the applicability of Rule 56 to its motion. Instead, Namibia argues that it is immune from this suit and that this Court lacks jurisdiction to adjudicate Plaintiff's claims against Namibia. ECF 71 & 91. The Court construes Namibia's motion as a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1).

*Metro. Area Transit Auth.*, 488 F. Supp. 3d 210, 213 (D. Md. 2020) (quoting *Evans*, 166 F.3d at 647)). This must be done without the court "drawing from the pleadings inferences favorable to the party asserting [jurisdiction]." *Sac & Fox Nation of Okla. v. Cuomo*, 193 F.3d 1162, 1168 (10th Cir. 1999) (quoting *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998)); *see also Norton v. Larney*, 266 U.S. 511, 515–16 (1925) ("[T]he jurisdiction of a federal court must affirmatively and distinctly appear and cannot be helped by presumptions or by argumentative inferences drawn from the pleadings.").

## IV.   <u>Analysis</u>

### A.  <u>Sovereign Immunity</u>

In its motion to dismiss, Namibia argues that, as a foreign state, it is immune from the claims asserted in this case. ECF 71. Based on the facts and evidence presented, the Court agrees and will grant the motion.

The Foreign Sovereign Immunities Act (the "FSIA"), codified at 28 U.S.C. §§ 1602–11, provides that foreign states are generally "immune from the jurisdiction of the courts of the United States and of the States" with limited exceptions. 28 U.S.C. § 1602. It is well established that foreign states have absolute immunity in United States courts except where provided by the FSIA. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428 (1989). Where the FSIA applies, there is no other basis for federal jurisdiction over foreign states. *See id.* at 439. Although the FSIA covers more than foreign sovereigns themselves, also granting immunity to foreign state agencies and instrumentalities, it does not cover foreign officials. *Samantar v. Yousuf*, 560 U.S. 305, 314–19 (2010).

The FSIA was designed in part to "transfer primary responsibility for deciding 'claims of foreign states to immunity' from the State Department to the courts." *Samantar*, 560 U.S. at 313

(quoting 28 U.S.C. § 1602). Sovereign immunity constitutes a threshold question in litigation, and it should be addressed "as near to the outset of the case as is reasonably possible." *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170, 174 (2017). Immunity is presumed for a foreign state. *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 31 (2015). To overcome this presumption, a complaint must "set forth 'sufficient facts to support a reasonable inference that [the] claims' satisfy one of the specific, enumerated exceptions in the FSIA." *France.com, Inc. v. French Republic*, 992 F.3d 248, 252 (4th Cir. 2021) (quoting *Rux v. Republic of Sudan*, 461 F.3d 461, 468 (4th Cir. 2006)). If the plaintiff manages to do so, "the burden then shifts to the defendant to prove by a preponderance of the evidence that [an enumerated FSIA] exception does not apply." *Pradhan v. Al-Sabah*, 299 F. Supp. 2d 493, 497 (D. Md. 2004).

   1. *Tortious Act Exception*

Plaintiff raises the tortious act exception to immunity under the FSIA. ECF 86 at 4. Plaintiff argues that Namibia "actively and knowingly harbored [her] for its and its diplomats' own benefit." ECF 86 at 10. This alleged harboring took the form of "securing and paying for the real property . . . paying for [Plaintiff's] food, driver, domestic and international travel and lodging . . . and paying Ms. Imene-Chanduru a small dependent child allowance per month." *Id*. at 10–11 (citing Am. Compl. ¶¶ 114–16) (cleaned up).

The tortious act exception generally applies in cases where "money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment . . . ." 28 U.S.C. § 1605(a)(5). This exception does not apply to claims "based upon the exercise or

performance or the failure to exercise or perform a discretionary function" or claims "arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights . . . ." *Id.* Apart from the foregoing, the tortious act exception may apply to any tort action for money damages, including tort claims arising under federal statutes.

In deciding whether the tortious act exception applies, the court must first determine the relevant acts or omissions that are attributable to the foreign sovereign. *Robinson v. Gov't of Malaysia*, 269 F.3d 133, 142 (2d Cir. 2001). Next, the court must decide whether these acts or omissions are tortious under the applicable law. *Id.* The tortious act exception only applies where the "entire tort" is committed within the United States. *In re Terrorist Attacks on Sept. 11, 2021*, 714 F.3d 109, 115–16 (2d Cir. 2013).

Even though sovereign immunity is a threshold question, a determination of whether a foreign state is responsible for a tortious act requires delving into the merits of the case. *See, e.g.*, *Robinson*, 269 F.3d at 143–46 (examining whether the Malaysian government committed or caused a tortious act under New York common law in its threshold FSIA analysis). Importantly, however, a plaintiff may not "circumvent the jurisdictional hurdle of the FSIA by inserting vague and conclusory allegations of tortious conduct in their complaints—and then . . . rely on the federal courts to conclude that some conceivable non-discretionary tortious act falls within the purview of these generic allegations under the applicable substantive law." *Id.* at 146. Applying the tortious act exception based on such vague and conclusory pleadings would be "at odds with the goal of FSIA to enable a foreign government to obtain an early dismissal when the substance of the claim against it does not support jurisdiction." *Id.*

Here, Plaintiff raises four claims against Namibia: (1) involuntary servitude, in violation of 18 U.S.C. § 1584; (2) forced labor, in violation of 18 U.S.C. § 1589; (3) indentured servitude

and forced labor trafficking, in violation of 18 U.S.C. § 1590; and (4) benefitting financially from indentured servitude, forced labor, and trafficking, in violation of 18 U.S.C. § 1593a. Am. Compl. ¶¶ 29–37. Section 1595 provides victims of such acts with a private right of action to recover damages and attorney's fees. 18 U.S.C. § 1595(a). Plaintiff alleges that Namibia is directly liable for the foregoing violations.[3]  ECF 86 at 4, 5, 8–10. She alleges that Namibia "knowingly and significantly" underpaid the Chandurus' child care allowance, to be used to compensate Plaintiff; "knowingly" benefited "from participation in a venture" with the Chandurus for obtaining Plaintiff's labor and services; and "knowingly recruited, harbored, and transported [Plaintiff] in support of her indentured servitude and forced labor . . . ." Am. Compl. ¶¶ 173, 182–83, 192, 203–04. Plaintiff argues in opposition to Namibia's motion that "Namibia *knowingly* and *actively* led the harboring of [Plaintiff]" by leasing and paying for the rental home in which she worked and lived with the Chandurus, where Plaintiff alleges she was trafficked, while "purposefully hid[ing] her from the lease documents"; by paying for her food and travel expenses; and by giving Ms. Imene-Chanduru a monthly stipend for child care. ECF 86 at 2–3, 10–11; *see also* Am. Compl. ¶¶ 112–19.

To prevail on each of Plaintiff's claims against Namibia, she must show that Namibia *knowingly* engaged in or benefitted from the proscribed activities. *See* 18 U.S.C. §§ 1584, 1589–90, 1593a. "Knowingly" is defined as "[i]n such a manner that the actor engaged in prohibited conduct with the knowledge that the social harm that the law was designed to prevent was practically certain to occur." *Knowingly*, BLACK'S LAW DICTIONARY (11th ed. 2019).

---

[3] Plaintiff does not allege that Namibia is vicariously liable through any conduct of Ms. Imene-Chanduru within the scope of her employment.

Plaintiff alleges in conclusory fashion that Namibia knowingly harbored her to obtain—or for the Chandurus to obtain—forced and involuntary labor or services, knowingly participated in a trafficking venture, and knowingly benefited from it. However, Plaintiff alleges no facts and presents no evidence to suggest that Namibia actually had knowledge of her working conditions or should have been aware of them. Plaintiff alleges that she was trafficked primarily in the Chandurus' private residence in Maryland and provides no information or evidence to suggest that the trafficking occurred under the supervision of the Namibian government or any Namibian agency or instrumentality. Plaintiff alleges that Namibia financed the Chandurus' lifestyle but offers no facts or evidence that Namibia did so with actual or constructive knowledge of their alleged wrongdoing.

Plaintiff attaches several exhibits to her opposition she contends prove a connection between Namibia and her treatment by the Chandurus: the lease application for the Chandurus' residence in Silver Spring, Maryland, ECF 86-1; two of the lease agreements for the residence, ECF 86-2 & 86-4; and two letters from the Namibian Ambassador requesting lease extensions in his name, ECF 86-3 & 86-5. Plaintiff also attaches interrogatory responses from the Chandurus, affirming that their rent in Maryland was entirely paid by Namibia. ECF 86-6 & 86-7. The lease application identifies the Embassy of Namibia[4] as the applicant on behalf of Ms. Imene-Chanduru and lists the Chandurus, their child, and Plaintiff as occupants, noting that Plaintiff is a nanny. ECF 86-1. The two lease agreements identify the Embassy of Namibia as the tenant and list the Chandurus, but not Plaintiff, as occupants. ECF 86-2 & 86-4.

Plaintiff's exhibits suffice to show that the Namibian government provided a residence for the Chandurus and Plaintiff, and was aware Plaintiff was living with the Chandurus and working

---

[4] Embassies are considered legal equivalents of foreign sovereigns for FSIA purposes. *See Sousa v. Embassy of Republic of Angola*, 229 F. Supp. 3d 23, 26 (D.D.C. 2017).

for them, but they offer no reason to believe that Namibia knew anything about Plaintiff's working conditions. Plaintiff emphasizes that Namibia included her in the residential rental application and later omitted her name from the actual leases, ECF 86 at 6–7, but it does not follow from this fact that Namibia was knowingly harboring her as an indentured servant or trafficking victim. The Namibian government provided Ms. Imene-Chanduru with a $157 monthly stipend that, according to Plaintiff, was intended to be used to pay Plaintiff for her services to the Chandurus. But Ms. Imene-Chanduru made clear in an interrogatory response that this stipend was merely a dependent child credit and was "not earmarked for payment to [Plaintiff], nor . . . earmarked specifically for child care." ECF 78-1 at 6. Although Plaintiff alleges that she was occasionally made to work in the Namibian Embassy and to cook for Namibian officials during special events, it cannot be reasonably inferred from these allegations that Namibia was aware that Plaintiff was being forced to work.

Plaintiff fails to demonstrate that the tortious act exception applies to this action. *See Robinson*, 269 F.3d at 145 (tortious act exception inapplicable because plaintiff failed to show that Malaysia had actual or constructive notice of a dangerous condition in one of its buildings).

### 2. *Commercial Activity Exception*

Plaintiff also raises the commercial activity exception to the FSIA as a basis for jurisdiction of her claims against Namibia. ECF 86 at 4. Plaintiff asserts that Namibia engaged in a commercial activity when it leased the Maryland residence and argues that her claim of harboring by Namibia is "based upon" the lease because the Chandurus could not have trafficked her without Namibia's "full financial assistance." ECF 86 at 6– 9. Namibia argues that the commercial activity exception does not apply because it was acting pursuant to its role as a sovereign by providing its diplomatic staff with a residence. ECF 91 at 7.

10

The commercial activity exception permits a federal court to exercise jurisdiction of a civil action against a foreign state if "the action is based upon a commercial activity carried on in the United States by the foreign state . . . ." 28 U.S.C. § 1605(a)(2). A commercial activity is statutorily defined as "either a regular course of commercial conduct or a particular commercial transaction or act." *Id.* § 1603(d). An activity is deemed commercial by reference to its nature, not its purpose. *Id.* A foreign sovereign engages in commercial activity "only when it exercises 'those powers that can also be exercised by private citizens,' and not when it employs 'powers peculiar to sovereigns.'" *France.com*, 922 F.3d at 252 (quoting *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992)) (internal citations omitted).

The FSIA does not define the phrase "based upon," but the U.S. Supreme Court has provided guidance for determining whether an action is "based upon" a commercial activity. "A court should identify the particular conduct [upon which a plaintiff's action is based] by looking to the basis or foundation for a claim; . . . those elements that, if proven, would entitle a plaintiff to relief; . . . and the gravamen of the complaint." *Sachs*, 577 U.S. at 33–34 (quoting *Saudi Arabia v. Nelson*, 507 U.S. 349, 356–57 (1993)) (cleaned up).

The instant suit is not "based upon" any commercial activity by Namibia. The gravamen of this civil action is Plaintiff's allegation that she was subjected to indentured servitude and forced labor in contravention of federal anti-human trafficking laws. Am. Compl. at 1. More specifically, Plaintiff alleges that she was grossly underpaid, held in debt bondage, had her passport and visa taken, and was verbally abused and threatened with deportation on a regular basis, and that she suffered injuries as a result. Am Compl. ¶¶ 171–74. All of the foregoing conduct—that is, "the 'particular conduct' that constitutes the 'gravamen' of the suit[,]" *Sachs*, 577 U.S. at 35—is attributed to the Chandurus; none of it is attributed to Namibia. The only "particular conduct" of

Namibia that Plaintiff argues may constitute "commercial activity" is Namibia's signing of the lease for the Chandurus' residence, where Plaintiff lived during the period of her alleged forced labor and trafficking.

Some courts have held the signing of a lease to be a commercial activity. *See Joseph v. Off. of Consulate Gen. of Nigeria*, 830 F.2d 1018, 1024 (9th Cir. 1987) ("There is nothing about the lease agreement . . . which distinguishes the transaction from an ordinary private commercial transaction, aside from the fact that the Consulate General of Nigeria was the tenant."); *Pradhan*, 299 F. Supp. 2d at 498 ("Signing an addendum for an extension of a lease agreement is certainly an act a private actor would take . . . . The purpose behind Al-Sabah's signing the addendum is irrelevant.") (cleaned up). *But see Swarna v. Al-Awadi*, 607 F. Supp. 2d 509, 516 (S.D.N.Y 2009), *aff'd in part, vacated in part*, 622 F.3d 123 (2d Cir. 2010) ("Providing [a home] to a diplomat is a power peculiar to sovereigns, as distinct from a power that can be exercised by private citizens.") (internal citations omitted).

The Court need not reach the question of whether Namibia engaged in a commercial activity here. The commercial activity exception only applies where the foreign state's commercial activity is the basis of the civil action, *Nelson*, 507 U.S. at 356–57, and, in the instant case, Namibia's activity is not. In *Pradhan*, the Court found the plaintiff's FSIA claim to be based on the signing of a lease, which the Court deemed commercial activity, because he was suing for unpaid rent and property damage that occurred during the rental period. 299 F. Supp. 2d at 495–96, 498. In contrast, the Fourth Circuit in *France.com* found that the plaintiff's injury (loss of ownership over the domain France.com) was *not* based on France's use of the domain France.com to promote tourism (a commercial activity), but rather on France's forcible seizure of the website in the first place (not a commercial activity). 922 F.3d at 253. In the instant case, Plaintiff's

injuries are based upon the conditions in which she was forced to work by the Chandurus–not Namibia's leasing of a rental property.

Plaintiff's argument that the trafficking could not have occurred without Namibia's financial assistance misses the mark. As explained above, Plaintiff does not allege any facts or present any evidence to show that Namibia leased the Chandurus' residence with actual or constructive knowledge that Plaintiff was being trafficked there. In *Nelson*, a simple "but-for" causal relationship between the foreign state's hiring and employment of the plaintiff to work at a state-run hospital (which the Court considered at least "arguably commercial activities") and the subsequent arrest and torture of the plaintiff for reporting safety violations at the hospital was not enough to bring the sovereign's conduct within the § 1605(a)(2) exception. 507 U.S. at 352–53, 358. Even assuming the Chandurus could not have trafficked Plaintiff in their residence without Namibia's patronage, it cannot be said that Namibia's actions here, whether commercial in nature or not, comprise the gravamen of the Amended Complaint. Therefore, the FSIA commercial activity exception does not apply.

Accordingly, based on the record before the Court, Namibia enjoys sovereign immunity from this suit, and its motion to dismiss will be granted.

## B. *Diplomatic Immunity*

In their motion to dismiss, the Chandurus argue that they are immune from this suit as diplomatic agents of a foreign state. ECF 69. They fail to show that Plaintiff's claims against them are barred by either diplomatic immunity or residual diplomatic immunity. Accordingly, the motion will be denied.

The Vienna Convention on Diplomatic Relations (the "VCDR") codifies the international community's recognition of diplomatic protections and privileges. *See Tabion v. Mufti*, 73 F.3d

535, 537–38 (4th Cir. 1996). Among other protections and privileges, the VCDR provides diplomatic agents "immunity from the criminal jurisdiction of the *receiving State*" and "immunity from its civil and administrative jurisdiction," with few exceptions. VCDR, art. 31(1), Apr. 18, 1961, 23 U.S.T. 3227 (emphasis added). One such exception to diplomatic immunity is for any "action relating to any professional or commercial activity exercised by the diplomatic agent in the receiving State outside his official functions." *Id.* art. 31(1)(c). The protections of the VCDR apply to "diplomatic agents," who are defined as "head[s] of the mission or [] member[s] of the diplomatic staff of the mission." *Id.* art. 1(e). The members of a diplomatic agent's family who reside in his or her household are also entitled to the privileges and immunities specified in Articles 29 through 36. *Id.* art. 37(1); *see also Tabion*, 73 F.3d at 536 (4th Cir. 1996) (finding that VCDR protections apply to both the First Secretary of the Jordanian Embassy and his spouse). Importantly, the purpose of diplomatic immunity "is not to benefit individuals but to ensure the efficient performance of the functions of diplomatic missions as representing states." *United States v. Al-Hamdi*, 356 F.3d 564, 575 n.13 (4th Cir. 2004) (quoting VCDR, *supra*, preamble, cl. 4). "The privilege extended to an individual diplomat is merely incidental to the benefit conferred on the government he represents." *Id.* (quoting *United States v. Cty. of Arlington*, 669 F.2d 925, 930 (4th Cir. 1982)).

The United States signed the VCDR, and, in 1978, Congress passed the Diplomatic Relations Act, making provisions of the VCDR governing law in the United States, 22 U.S.C. §§ 251–59. *See Tabion*, 73 F.3d at 536 n.1. United States courts are required to dismiss any action brought against an individual found to have diplomatic immunity under the terms of the treaty. 22 U.S.C. § 254d. For an individual to have diplomatic immunity recognized by the courts, his or her diplomatic status must first be recognized by the executive branch. *See Yousuf v. Samantar*, 699

F.3d 763, 772 (4th Cir. 2012) (diplomatic immunity as "'a quintessentially executive function' for which absolute deference is proper") (citation omitted); *United States v. Lumumba*, 741 F.2d 12, 15 (2d Cir. 1984) ("[R]ecognition by the executive branch—not to be second-guessed by the judiciary—is essential to establishing diplomatic status.") (citation omitted). This requirement of recognition ensures that foreign officials not be permitted to invoke diplomatic immunity unilaterally. *Id*. Article 39 of the VCDR details when diplomatic immunity is terminated, and the level of immunity, if any, that survives the completion of diplomatic duties:

> When the functions of a person enjoying privileges and immunities have come to an end, such privileges and immunities shall normally cease at the moment when he leaves the country, or on expiry of a reasonable period in which to do so, but shall subsist until that time, even in case of armed conflict. However, with respect to acts performed by such a person in the exercise of his functions as a member of the mission, immunity shall continue to subsist.

VCDR, art. 39(2). This "residual" diplomatic immunity does not extend to members of the diplomat's family. *See id.* art. 37(1) (limiting privileges and immunities enjoyed by diplomat's family members to those specified in articles 29 to 36, not including article 39); *Swarna v. Al-Awadi*, 622 F.3d 123, 134 (2d Cir. 2010) (holding that the spouse of a former Kuwaiti diplomat was not entitled to residual immunity). Additionally, residual diplomatic immunity is considerably narrower than regular diplomatic immunity, only applying to "acts performed . . . in the exercise of [the diplomat's] functions as a member of the mission."[5] *Id.* (quoting VCDR, *supra*, art. 39(2)).

---

[5] Functions of a diplomatic mission are set out in a non-exhaustive list contained in Article 3 of the VCDR:

> (a)  representing the sending State in the receiving State;
> (b)  protecting in the receiving State the interests of the sending State and of its nationals;
> (c)  negotiating with the government of the receiving State;
> (d)  ascertaining by all lawful means conditions and developments in the receiving State, and reporting thereon to the Government of the sending State;

Courts have restricted application of residual diplomatic immunity to "official acts," *Swarna*, 622 F.3d at 137—acts that are "directly imputable to the state or inextricably tied to a diplomat's professional activities," or that at least "fall within the 'ambit' of the diplomatic agent's 'professional responsibilities,'" *United States v. Al Sharaf*, 183 F. Supp. 3d 45, 52–53 (D.D.C. 2016) (quoting *Swarna*, 622 F.3d at 135, and *Brzak v. United Nations*, 597 F.3d 107, 113 (2d Cir. 2010)). Determining whether a diplomatic agent's conduct constitutes an "official act" covered by residual immunity requires an objective assessment of the functional significance of the conduct, without judging whether the conduct "actually occurred, or whether it was wrongful." *Swarna*, 622 F.3d at 137 (quoting *Brzak*, 597 F.3d at 113).

Additionally, the United Nations Convention on Privileges and Immunities grants member states' representatives to the United Nations certain privileges and immunities, including "immunity from legal process of every kind[]" "in respect of words spoken or written and all acts done by them in their capacity as representatives[.]" U.N. Convention on Privileges and Immunities (the "U.N. Convention"), Feb. 13, 1946, art. IV, § 11(a), 21 U.S.T. 1418. Article IV, § 11 also contains a catch-all provision granting U.N. representatives "such other privileges, immunities and facilities . . . as diplomatic envoys enjoy" that are "not inconsistent with" other privileges and immunities enumerated in § 11, except exemption from customs duties, excise duties, or sales taxes. *Id.* § 11(g). Some courts have interpreted this provision to clothe U.N. representatives with all the diplomatic protections provided in the VCDR. *See Tachiona v. United States*, 386 F. 3d 205, 215–20 (2d Cir. 2004) (citing U.N. Convention, *supra*, art. IV, § 11(g)).

---

(e)  promoting friendly relations between the sending State and the receiving State, and developing their economic, cultural and scientific relations.

VCDR, *supra*, art. 3(1).

*1. Julia Imene-Chanduru*

At the time of the violations alleged in this case, Ms. Imene-Chanduru served as a diplomatic agent for Namibia in the United States, Am. Compl. ¶ 21, and therefore enjoyed broad diplomatic immunity under Article 31 of the VCDR. However, Ms. Imene-Chanduru's full diplomatic immunity under the VCDR terminated when she left the United States following the end of her diplomatic duties here. *See id.* ¶¶ 126, 151; VCDR, *supra*, art. 39(2). At that point, she only retained residual diplomatic immunity conferred by Article 39(2) "with respect to acts [she] performed . . . in the exercise of [her] functions as a member of the mission[.]" *Id.*

In the Amended Complaint, Plaintiff alleges that, among other things, Ms. Imene-Chanduru forced her to work 18-hour days, seven days a week; to cater for private parties at the Chandurus' personal residence; and to babysit her friends' children in Virginia while Ms. Imene-Chanduru "[went] out on the town." Am. Compl. ¶¶ 49–54. Ms. Imene-Chanduru's conduct, as alleged, did not serve any official function, was not tied to her professional activities as a diplomatic agent, and did not fall within the ambit of her professional responsibilities. Therefore, Ms. Imene-Chanduru's residual diplomatic immunity does not apply to this suit.

Other courts have declined to apply residual diplomatic immunity to conduct related to the employment of domestic workers for personal benefit not tied to official functions. Citing the Ninth Circuit's decision in *Park v. Shin*, 313 F.3d 1138, 1142 (9th Cir. 2002),[6] the U.S. Court of Appeals for the Second Circuit in *Swarna* determined that residual diplomatic immunity "does not apply to actions that pertain to [a diplomat's] household or personal life and that may provide, at best, 'an indirect' rather than a 'direct . . . benefit to' diplomatic functions." , 622 F.3d at 134–35.

---

[6] Although the issue in *Park* was one of consular immunity, "[t]he standard for residual diplomatic immunity is virtually identical to that for consular immunity." *Rana v. Islam*, 305 F.R.D. 53, 60 (S.D.N.Y. 2015) (comparing VCDR *supra*, art. 39(2), with Vienna Convention on Consular Relations art. 43(1), Apr. 24, 1963, 21 U.S.T. 77).

The court determined that a Kuwaiti diplomat's employment of a domestic worker was not an official act because the worker was hired to cook, clean, and care for the diplomat's children, and only incidentally cooked and served guests at official functions. *Id.* at 138.  Similarly, in *Baoanan v. Baja*, the district court found that the employment of a domestic worker by a diplomat and his spouse was not an official act, even though the worker lived and worked in the Philippine Mission. 627 F. Supp. 2d 155, 167–68 (S.D.N.Y. 2009). The *Baoanan* court reasoned that, like in *Swarna*, the domestic worker was only hired to cook, clean, do laundry, and take care of the diplomat's children. *Id.* In both cases, the domestic workers were at times additionally tasked with cooking for official diplomatic events and cleaning up after parties, which the district court in each case deemed "tangential benefit[s]" to the diplomatic mission that failed to transform the workers into diplomatic employees. *Id.* at 168; *Swarna*, 607 F. Supp. 2d at 520.

In the instant case, Plaintiff lived and worked in the Chandurus' residence in Silver Spring, Maryland—not in the Namibian Embassy in Washington, DC—and she was tasked with cooking, cleaning, doing laundry, and taking care of the couple's young child. Am. Compl. ¶¶ 46–53. Although she occasionally cooked for official events, Plaintiff's primary role was to serve as a domestic worker for the Chandurus for their personal benefit—not for the benefit of Namibia or its diplomatic mission. Ms. Imene-Chanduru's alleged conduct in this case solely "pertained to her household or personal life," without any "direct benefit to diplomatic functions." *Swarna*, 622 F.3d at 134–35 (cleaned up). Her employment of Plaintiff was not an official act, and, therefore, her residual diplomatic immunity under Article 39(2) the VCDR does not protect her from this suit.

The Chandurus' reliance upon *Tabion v. Mufti* is misplaced. In *Tabion*, the Fourth Circuit held that a sitting Jordanian diplomat, then stationed in the United States, was immune from suit from his housekeeper under Article 31 of VCDR. 73 F.3d at 539. As discussed above, Ms. Imene-

Chanduru is no longer a diplomat serving in the United States and, therefore, she no longer enjoys the broad immunity conferred by Article 31 of VCDR. *See* VCDR, *supra*, art. 39(2).

The Chandurus distinguish *Swarna* on the grounds that, as a current U.N. representative, Ms. Imene-Chanduru remains part of Namibia's diplomatic mission. ECF 82 at 5–6. Plaintiff acknowledges in the Amended Complaint that Ms. Imene-Chanduru "is currently the Permanent Representative of the Republic of Namibia to the United Nations in Geneva, Switzerland[,]" a position she has held since February 2021. Am. Compl. ¶¶ 4, 150. The Chandurus argue that, as a U.N. representative, Ms. Imene-Chanduru retains the same VCDR protections that she held while serving as a diplomatic agent in the Namibian Embassy in Washington, DC and is protected by the U.N. Convention on Privileges and Immunities. *Id.* at 6–7.

The Chandurus' argument fails for several reasons. First, Article IV, § 11(a) of the U.N. Convention only confers immunity from legal process for the conduct of U.N. representatives "done . . . in their capacity as representatives[.]" U.N. Convention, *supra*, art. IV, § 11(a). Here, the conduct of Ms. Imene-Chanduru alleged in the Amended Complaint was done outside her capacity as a U.N. representative because it is alleged to have occurred before she even became a U.N. representative. There has been no showing that Ms. Imene-Chanduru's employment of Plaintiff in the United States between 2007 and 2011 bears any relation to her official U.N. duties in Switzerland, first undertaken in 2021.

Second, even assuming the catch-all provision in § 11(g) encompasses the broad diplomatic immunity conferred by Article 31 of the VCDR, that broad immunity expired when Ms. Imene-Chanduru's diplomatic post at the Namibian Embassy ended and she subsequently left the United States. *See* VCDR, *supra*, art. 39(2). As discussed above, the residual diplomatic immunity Ms. Imene-Chanduru has retained under Article 39(2) of the VCDR does not cover the conduct alleged

19

in the Amended Complaint. *See Swarna*, 622 F.3d at 134–35 (holding residual diplomatic immunity not applicable to actions pertaining to diplomat's "household or personal life" with no "direct benefit to diplomatic functions . . .") (cleaned up); *Swarna*, 607 F. Supp. 2d 509 (finding diplomatic immunity not applicable to labor trafficking claims against Kuwaiti representative to the U.N. after he was transferred from the United States to France).

Third, any immunity Ms. Imene-Chanduru enjoys under the U.N. Convention requires recognition by the executive branch of the United States to warrant the dismissal of the claims pending against her in this Court. *United States v. Al-Hamdi*, 356 F.3d 564, 571 (4th Cir. 2004) ("[I]n the context of diplomatic immunity, the receiving state always has had 'broad discretion to classify diplomats.'") (citation omitted); *Lumumba*, 741 F.2d at 15 ("[The VCDR] and the corresponding statute . . . premise diplomatic immunity upon recognition by the receiving state."); *United States v. Kuznetsov*, 442 F. Supp. 2d 102, 106 (S.D.N.Y. 2006) ("[D]iplomatic immunity is premised upon recognition by the receiving state."). Ms. Imene-Chanduru cannot unilaterally assert diplomatic immunity. "[R]ecognition by the executive branch . . . is essential to establishing diplomatic status." *Lumumba*, 741 F.2d at 15. The Chandurus have made no showing that the executive branch currently recognizes Ms. Imene-Chanduru's diplomatic status in the United States.

The Chandurus' motion will be denied as to Plaintiff's claims against Ms. Imene-Chanduru.

2. *Simbarashe Britone Chanduru*

Mr. Chanduru is the spouse of Ms. Imene-Chanduru. Am. Compl. ¶ 5. As discussed above, Ms. Imene-Chanduru was a diplomatic agent for Namibia in the United States between 2007 and 2011, and now serves as the Permanent Representative of the Republic of Namibia to the United

Nations in Geneva. Am. Compl. ¶¶ 21, 150. Although the Chandurus describe Mr. Chanduru as a "career diplomat" who had been "stationed at the Namibian Embassy in Washington, DC," ECF 69 at 5, this description is contradicted by Mr. Chanduru's own responses to interrogatories, in which he states, from 2007 through 2011, he "was not employed by Namibia" and was "unemployed for most of the time." ECF 78-2 at 6; ECF 86-7 at 6. The Chandurus also describe Mr. Chanduru as "part of the diplomatic corp [sic] of Namibia" in Geneva, ECF 82 at 4, but offer no evidence that he currently holds any diplomatic position.

Mr. Chanduru enjoyed certain privileges and immunities as the live-in spouse of a diplomatic agent between 2007 and 2011, *see* VCDR, *supra*, art. 37(1), but these protections expired no later than February 2021 when Ms. Imene-Chanduru was assigned to represent Namibia at the United Nations Office in Geneva, *see id.* art. 39. The VCDR does not provide residual diplomatic immunity for members of a diplomat's family. *See id.* art. 37(1) (limiting privileges and immunities enjoyed by diplomat's family members to those specified in articles 29 through 36, and not including residual diplomatic immunity provided in article 39). In *Swarna*, the Second Circuit held that the spouse of the Kuwaiti diplomat had no residual immunity, reasoning that although she "was accredited as [the diplomat]'s spouse, . . . she was never a member of the Kuwait Mission[,]" and therefore "enjoys no residual immunity from the civil jurisdiction of the United States." 622 F.3d at 134 (internal citations omitted). Similarly, here, the Chandurus have provided no evidence that Mr. Chanduru was ever a member of Namibia's diplomatic mission and no basis for a finding that he enjoys any diplomatic immunity from civil suit in the United States.

Accordingly, the Chandurus' motion to dismiss will be denied as to Plaintiff's claims against Mr. Chanduru.

V.    **Conclusion**

For the reasons stated above, the Republic of Namibia's motion to dismiss will be granted, and Julia Imene-Chanduru and Simbarashe Britone Chanduru's motion to dismiss will be denied. Plaintiff's claims against Namibia shall be dismissed without prejudice.[7]

A separate Order follows.


  January 16, 2024__                                    _____/S/_____
Date                                                    Matthew J. Maddox
                                                        United States District Judge

---

[7] "[S]overeign immunity deprives federal courts of jurisdiction to hear claims, and a court finding that a party is entitled to sovereign immunity must dismiss the action for lack of subject-matter jurisdiction." *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 649 (4th Cir. 2018). A dismissal for lack of subject matter jurisdiction "must be one without prejudice, because a court that lacks jurisdiction has no power to adjudicate and dispose of a claim on the merits." *Goldman v. Brink*, 41 F.4th 366, 369 (4th Cir. 2022) (quoting *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 185 (4th Cir. 2013)).